IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:05-cv-403-A |
| | ) | |
| EUGENE ROBERT CHURCH, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S REPLY TO THE UNITED STATES'S RESPONSE TO § 2255 MOTION

COMES NOW EUGENE ROBERT CHURCH, pro se, and in opposition to the Government's Response to his §2255 motion, shows the Court as follows:

Defendant entered a plea agreement which consisted of the Government's recitation of the terms and conditions, one of which was a waiver of his right to appeal the sentence or to file a post-conviction motion, which was referred to as a collateral attack upon his sentence.

Petitioner did not have any idea of was meant by a "collateral attack" on his conviction or sentence, and, as a result had no knowledge as to what it was that he was purporting to waive in the oral plea agreement. Defendant did not understand the function and purpose of a post-conviction proceeding, thus he had no idea of what right it was that he was agreeing to waive. The explanation given to him of the function and purpose of a post-conviction motion. His attorney did not explain the purpose of such a motion,

- 1 -

so that Petitioner's "waiver" of the right to file a post-conviction motion was not a knowing and intelligent waiver.  The waiver, to be valid, must be knowingly and intelligently and voluntarily done in order to be a valid waiver.  <u>United States</u> v. <u>Bushert</u>, 997 F.2d 1343 (11th CIr. 1993); <u>Allen</u> v. <u>Thomas</u>, 161 F.3d 667 (11th Cir. 1998).

A careful look at the explanation offered the Petitioner about the post-conviction rights he was purportedly waiving is in order.  The transcript discloses the following colloquy between the Court and the Defendant:

> THE COURT:  All right.  Now the terms of the agreement was stated.  The defendant was not present so I'll ask the prosecutor to state the terms of the plea agreement.
>
> MR. FEAGA:  Yes, sir, Your Honor.  There is one other thing that I did not mention either, back there, and that is if the Court at the time of sentencing--Well, I'll restate them and then I'll state the one I neglected to state.
>
> The agreement that we've entered into, the defendant will plead guilty to all four counts of the indictment.  If he pleads guilty to all four counts of the superseding indictment, and if he cooperates with the United States by providing substantial assistance, which we define as testifying truthfully when called upon to do so for the United States, starting next week in a trial that we will have Monday of an individual in a case called United States of America vs. Calvin Couch, if he testifies truthfully when called onto do so and he pleads guilty to all four counts, we will recommend to the Court under a plea taken in accordance with Federal Rule of Criminal Procedure 11(c)(1_(b), it will be strictly a recommendation to the Court, that he receive a sentence of sixteen years.
>
> The other thin, though, that we would.ask for, Your Honor, is if the Court does go along with the recommendation of the United States and imposes a sentence that does not exceed 16 years that will be recommended, that the defendant, assuming he gets that sentence and not more, would waive his right to appeal.  If he gets more than that, obviously the appeal waiver would not be enforced and he could appeal.

Transcript of Change of Plea Proceedings, pp. 60-61.

Most notably absent from the recitation is any discussion concerning the waiver of the right to file a §2255 motion.

- 2 -

However, the Court, apparently inadvertently, amended the plea agreement in the following colloquy that occurred between the Court and the Defendant:

> THE COURT: And you understand, I believe I asked you this, that by entering this plea agreement and entering a plea of guilty, that if I accept the plea agreement and sentence you to sixteen years and no more than that and the other provisions of the agreement, that you will have waived, that is given up your right to appeal or collaterally attack all or any part of this sentence? Do you understand that?
>
> A.   Yes, Your Honor.

The Government rests is claim of a waiver of the right to file a motion under §2255 on a very slender reed indeed. There was clearly no agreement between the Defendant and the Government to waive the right to collaterally attack his sentence.

Consequently, it is difficult to believe that the Government asserts a waiver of the right to file a §2255 motion in good faith. Counsel for the Government represents a unique party--the United States of America. TO make such a groundless assertion as it makes it claiming the Defendant waived his right to file a post-conviction motion on the above-quoted record is to demean the dignity of the United States. Zealous advocacy for one's cause does not properly include the making of irresponsible claims. The practice is reprehensible  and should not be countenanced.

Government counsel urges that the legal claims in Defendant's §2255 motion are procedurally defaulted, and Defendant has not demonstrated cause and prejudice . The Government summarizes, correctly, the nine (9) claims made by Movant for vacating and correcting the fifteen (15) year sentence imposed in this case.

- 3 -

As noted above, the Government clearly is in error in its assertion that Defendant has waived his right to proceed with a motion pursuant to 28 U.S.C. §2255. The inescapable conclusion is that Defendant has not done so, and, as a consequence, there is no legal impediment to the consideration of the claims that he raises in his motion.

The Government urges that even if Defendant has not waived his right to file a motion pursuant to 28 U.S.C. §2255, he has procedurally defaulted on the legal claims presented in his motion due to the fact that he did waive his right to appeal in connection with his plea agreement.

It is accurate that Defendant did not appeal the conviction and sentence in the case and that he had agreed no to do so. But his agreement not to appeal cannot constitute procedural default where the agreement to waive the right to appeal is inextricably bound up in his ineffective assistance of counsel claim. If Defendant waived his right to appeal on the basis of inadequate or erroneous advice from his counsel, it cannot be said that his waiver  was valid because the agreement to waive the right to appellate review was a product of ineffective assistance of counsel which would constitute the establishment of cause and prejudice, thereby excusing the procedural default. It is true that claims not raised on direct appeal that could have been are generally barred from review in §2255 proceedings. This general rule, articulated in McCoy v. United States, 266 F.3d 1245, 1258 (11th Cir. 2001) did not involve a question of ineffective assistance of counsel.

- 4 -

## DEFENDANT'S CIRCUMSTANCES MEET THE REQUIREMENTS
## TO ESTABLISH INEFFECTIVE ASSISTANCE OF COUNSEL

In a long line of cases that includes <u>Powell</u> v. <u>Alabama</u>, 287 U.S. 45 (1932), <u>Johnson</u> v. <u>Zerbst</u>, 304 U.S. 458 (1938), and <u>Gideon</u> v. <u>Wainwright</u>, 372 U.S. 335 (1963), the Supreme Court has recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial. The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause:

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been previously ascertained by law, and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel."

Thus a fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the "ample opportunity to meet the case of the prosecution" to which they are entitled. <u>Adams</u> v. <u>United States</u>, ex rel. <u>McCann</u>, 317 U.S. 269 )1942); see <u>Powell</u> v. <u>Alabama</u>, supra, at 68-69, 55, 84 ALR 527.

Because of the vital importance of counsel's assistance, the Supreme Court has held that, with certain exceptions a person accused of a federal or state crime has the right to have counsel appointed if retained counsel cannot be obtained. See Argersinger v. Hamlin, 407 U.S. 25 (1972); Gideon v. Wainwright, supra; Johnson v. Zerbst, supra. That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to insure that the trial is fair.

For that reason, the Supreme Court has recognized that "the right to counsel is the right to the effective assistance of counsel." McMann v. Richardson, 397 U.S. 759 (1970); see also Strickland v. Washington, 466 U.S. 668 (1984). Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense. See e.g., Geders v. United States, 425 U.S. 80 (1976) (bar on attorney-client consultation during overnight recess); Herring v. New York, 422 U.S. 853 (1975); (bar on summation at bench trial); Brooks v. Tennessee, 406 U.S. 605 (1972) (requirement that defendant be first defense witness); Ferguson v. Georgia, 365 U.S. 570 (1961) (bar on direct examination of defendant). Counsel, however, can also deprive a defendant

- 6 -

of the right to effective assistance, simply by failing to render "adequate legal assistance," Cuyler v. Sullivan, 466 U.S., at 344 (actual conflict of interest adversely affecting lawyer's performance renders assistance ineffective).

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that rendered the results unreliable.

As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance. See Trapnell v. United States, 725 F.2d at 151-152. The Court indirectly recognized as much when it stated in McMann v. Richardson, supra, at 770-771, that a guilty plea cannot be attacked as based on inadequate legal advice unless counsel was not "a reasonably competent attorney" and the advice was not "within the range of competence demanded of attorneys in criminal cases." See also Cuyler v. Sullivan, supra, at 334.

When a convicted defendant complains of the ineffectiveness of counsel's repersentation fell below an objective standard of reasonableness.

More specific guidelines are not appropriate. The Sixth Amendment refers simply to "counsel," not specifying particular requirements of effective assistance, It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. See Michel v. Louisiana, 350 U.S. 91 (1955). The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owns the client a duty of loyalty, a duty to avoid conflicts of interest. See Cuyler v. Sullivan, supra, at 346. From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process. See Powell v. Alabama, 278 U.S. at 68-69.

These basic duties neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney

- 8 -

performance. In any case presenting an ineffectiveness claim,
the performance inquiry must be whether counsel's assistance
was reasonable considering all the circumstances. Prevailing
norms of practice as reflected in American Bar Association standards
and the like, e.g., ABA Standards for Criminal Justice 4-1.1
to 4-8.6 (2d ed 1980) ("The Defense Function"), are guides to
determining what is reasonable, but they are only guides. No
particular set of detailed rules for counsel's conduct can satis-
factorily take account of the variety of circumstances faced
by defense counsel or the range of legitimate decisions regarding
how best to represent a criminal defendant. Any such set of rules
would interfere with the constitutionally protected independence
of counsel and restrict the wide latitude counsel must have in
making tactical decisions. See United States v. Decoster, 199
U.S. App DC, at 371. Indeed, the existence of detailed guidelines
for representation could distract counsel from the overriding
mission of vigorous advocacy of the defendant's cause. Moreover,
the purpose of the effective assistance guarantee of the Sixth
Amendment representation, although that is a goal of considerable
importance to the legal system. The purpose is simply to ensure
that criminal defendants receive a fair trial.

Judicial scrutiny of counsel's performance must be highly
deferential. It is all too tempting for a defendant to second-
guess counsel's assistance after conviction or adverse sentence,
and it is all too easy for a court, examining counsel's defense
after it has proved unsuccessful, to conclude that a particular

act or omission of counsel was unreasonable. Cf. Engle v. Isaac,
456 U.S. 107 (1982). A fair assessment of attorney performance
requires that every effort be made to eliminate the distorting
effects of hindsight, to reconstruct the circumstances of counsel's
challenged conduct, and to evaluate the conduct from counsel's
perspective at the time. Because of the difficulties inherent
in making the evaluation, a court must indulge a strong presumption
that counsel's conduct falls within the wide range of reasonable
professional assistance; that is, the defendant must overcome
the presumption that, under the circumstances, the challenged
action "might be considered sound trial strategy." See Michel v.
Louisiana, supra, at 101. There are countless ways to provide
effective assistance in any given case. Even the best criminal
defense attorneys would not defend a particular client in the
same way. See Goodpaster, The Trial for Life: Effective Assistance
of Counsel in Death Penalty Cases, 58 NYU L Rev 299. 343 (1983).

The availabilty of intrusive post-trial inquiry into attorney
performance or of detailed guidelines for its evaluation would
encourage the proliferation of ineffectiveness challenges. Criminal
trials resolved unfavorably to the defendant would increasingly
come to be followed by a second trial, this one of counsel's
unsuccessful defense. Counsel's performance and even willingness
to serve could be adversely affected. Intensive scrutiny of counsel
and rigid requirements for acceptable assistance could dampen
the ardor and impair the independence of defense counsel, dis-
courage the acceptance of assigned cases, and undermine the trust

between attorney and client.

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may

- 11 -

be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. See United States v. Decoster, 199 U.S. App DC, at 372-373.

The foregoing authorities clearly establish that Defendant's counsel had an affirmative duty to represent him in an objectively reasonable manner, and a failure to do so constituted a violation of Defendant's right to counsel guaranteed him under the Sixth Amendment to the Constitution of the United States.

Counsel's failure to object to the judicial fact-finding regarding the drug quantity for which Defendant was to be held responsible was objectively unreasonable in light of the Supreme Court's holding in Apprendi v. New Jersey, 530 U.S. 466 (2000).

The Government urges that Booker no retroactive effect in any event, so the issue of whether Apprendi applies through Booker is not relevant, particularly in light of the Eleventh Circuit's holding in United States v. Shelton, 400 F.3d 1325 (11th Cir. 2005) and Varela v. United States, 400 F.3d 864, 867-868 (11th Cir. 2005). The Government urges that because the Defendant admitted to the facts that determined his sentence, no Sixth Amendment violation occurred. But counsel's failure to recognize the Sixth

- 12 -

Amendment implications of the Court's action in finding facts which served to increase the sentence.

The Government stresses the fact that Defendant agreed to the imposition of a sentence of 16 years, but actually received a sentence of fifteen years. However, the argument in this respect ignores the fact that Defendant was entirely dependent upon his lawyer for advice, and the actions Defendant took in his criminal case were based upon the advice of his counsel. However, the advice of his counsel was incorrect in certain material respects. For example, Defendant's counsel told him that the presence of the firearm was all that was required to render Defendant liable under 18 U.S.C. §924(c), which required a consecutive five (5) year sentence.

The presence of the firearm was purely incidental, and was not employed in any way in connection with the offense of possession with intent to distribute methamphetamine. The Defendant's plea entered on this Court was not knowingly and voluntarily entered because Defendant was relying on the advice of his counsel, which was erroneous, that is, the advice of counsel that Defendant was guilty of the §924(c) count by simply having a firearm present while he possessed actually or constructively a controlled substance. Counsel's assertion as to the law in this respect is in error and cannot constitute a basis for tendering a plea of guilty. Unless the firearm actually facilitates the underlying drug crime, the presence of a firearm is merely incidental, and is not a basis for the invocation of 18 U.S.C. §924(c). Defendant, however, did not know this, and, relying on his counsel's erroneous advice,

- 13 -

tendered a plea of guilty to the offense charging him with a violation of 18 U.S.C. §924(c).

Whether Defendant possessed the firearm for the purpose of facilitating the commission of a drug trafficking crime is, of course, a question of fact for the fact-finder.  In this case, the Defendant entred a plea of guilty to this count, but not without some protest.  The affidavit supplied by Defendant's counsel is illuminating on this point, which provided, in part:

> Church admitted to owning the firearms that were confiscated by the arresting officers and he admitted that he did not possess a license to carry or possess a firearm.

It should be noted by the Court that counsel's affidavit makes no reference to the waiver of the right to file a motion under 28 U.S.C.§2255.

Counsel's affidavit is rather straight forward.  He did advise Defendant that he was a solo practitioner, and that he would be facing a legal team fielded by the United States consisting of may investigators, lawyers, and staff personnel, and that such a team would be very formidable.  He advised Defendant that he would be convicted based on the evidence he had seen.

Defendant relied on the advice of his counsel when his counsel told him that the presence of a firearm, coupled with the possession of a controlled substance was sufficient to violate the provisions of 18 U.S.C. §924(c), whether the firearm played any role in the drug trafficking crime or not because the firearm would always be regarded as protection for the controlled substances, thereby facilitating the crime of possession with the intent to distribute. This advice formed the basis for the Defendant's reluctant plea

- 14 -

to the §924(c) charge occurred.

Following the advice of his attorney, Defendant entered a plea of guilty to the §924(c) charge, even though Defendant knew the firearms were not related in any way to the possession of the methamphetamine.  The firearms had not been deployed in any manner which would have justified the inference that the firearms facilitated the possession of the methamphetamine with the intent to distribute it.  But because Defendant's counsel insisted that the mere presence of firearms at the situs of some methamphetamine constituted a violation of 18 U.S.C. §924(c), Defendant ultimately capitulated to the advice of his counsel and entered a plea of guilty to the §924(c) charge, even though he did not possess any of the firearms for the purpose of facilitating a drug trafficking crime.

### THE COURT'S MISTAKEN VIEW THAT THE SENTENCING GUIDELINES IS A STRUCTURAL ERROR THAT AFFECTS THE FAIRNESS OF OF THE SENTENCING PROCESS

At the time Defendant was sentenced by the Court, the Court was acting under the mistaken belief that the Federal Sentencing Guidelines were mandatory and not merely advisory.  Thus, at the time the Defendant was sentenced, the Court did not recognize the fact that its sentencing discretion was far broader than it believed at the time.  Acting on the mistaken belief that the Court had no discretion but to follow the Sentencing Guidelines, the Court imposed a sentence that was harsher than what the Court would have imposed without the Sentencing Guidelines.

In not recognizing the sentencing authority actually possessed by the Court, the Court committed a structural error.

- 15 -

### The Sentencing Error is Structural

In those circumstances in which a defendant's Fifth Amendment right to due process, (that is the right to be sentenced only on the factual basis found by a jury beyond-a-reasonable-doubt or admitted by a defendant) and the Sixth Amendment right to trial by jury, was violated by the enhancement of a defendant's sentence, such a violation under a guideline scheme thought to be mandatory in nature, where a judge not a jury finds the facts, and by the wrong standard of proof (by the preponderance-of-evidence) will always qualify as structural error.

Structural Error: The United States Supreme Court held in United States v. Booker, 534 U.S. ____, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), in a two part opinion that the Federal Sentencing Guide-lines violated defendant's Fifth Amendment right to due-process, and their Sixth Amendment right to trial-by-jury. Quoting Justice Stevens in part one:

> It has been settled throughout our history that the constitution protects every criminal defendant "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). It is equally clear that the "Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged." United States v. Gaudin, 515 U.S. 506, 511 (1995). These basic precepts, firmly rooted in the common law, have provided the basis for recent decisions interpreting modern criminal statutes and sentencing procedures.

The Court's holding were also based in part, on the principle recognized in Apprendi v. New Jersey, 530 U.S. 466,147 L.Ed.2d 435, 120 S.Ct. 2348 (2000), that "any fact other than a prior

- 16 -

conviction that increases a defentant's sentence, must be found by a jury, and proved beyond a reasonable doubt, or admitted to by the defendant."

In a somewhat more established line of precedent, the United States Supreme Court has distinguished between "structural errors" that always require reversal (such as the total denial of counsel, racial discrimination in the selection of a grand jury, and defects in reasonable doubt instructions), and mere trial errors that are subject to harmless error analysis (when the defendant objected) or plain error analysis (when the issue was not preserved). Structural errors have been described by the Court in Sullivan v. Louisiana, 508 U.S. 275 (1993) as "a defect affecting the framework within which the trial proceeds," and an error that "infect[s] the entire trial process."

In Sullivan, the Supreme Court held that a defect in a jury instruction describing reasonable doubt was structural error. The Court observed that the question that harmless-error analysis requires a reviewing court to consider "is not what effect it had upon the guilty verdict in the case at hand...." The Sullivan court added:

> The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered--no matter how inescapable the findings to support that verdict might be--would violate the jury trial guarantee....
>
> Once the proper role of an appellate court engaged in the [harmless error] inquiry is understood, the illogic of harmless error review in the present case becomes

evident.... There being no jury verdict of guilty beyond
a reasonable doubt, the question whether the same verdict
of guilty beyond a reasonable doubt would have been rendered
absent the constitutional error is utterly meaningless.
There is no object, so to speak, upon which harmless error
scrutiny can operate. The most an appellate court can con-
clude is that a jury would surely have found petitioner
guilty beyond a reasonable doubt--not that the jury's actual
finding of guilty beyond a reasonble doubt would surely not
have been different absent the constitutional error. That
is not enough.... The Sixth Amendment requires more than
appellate speculation about a hypothetical jury's action,
or else directed verdicts for the State would be sustainable
on appeal; it requires an actual jury finding of guilty....

The situation described in this exposition of harmless-error analysis

in Sullivan is "directly analogous to the situation presented by

judges, rather than juries, finding facts necessary to increase

sentences by the wrong standard of proof.

Before and after the high Court's ruling in Booker, the federal

court's of appeals that have addressed the issue have held, that

the absence of a jury finding as to a fact that increased the

maximum term of a guideline sentence is not structural error.

These courts have relied on the holding in Neder v. United States,

527 U.S. 1, (1999), that a jury instruction that failed to require

the jury to find one element of the offense was not a structural

error and therefore was subject to harmless error analysis.

Neder Doesn't Apply: The situation arising in Petitioner's

Fifth and Sixth Amendment violations is readily distinguishable

from the scenario in Neder. The jury-trial error in Neder arose

out of a practice of having trial judges make the determination

whether statements prosecuted as perjury were "material," instead

of sending the materiality issue to the jury. As noted above,

the Neder court found the absence of a jury finding on the fact

- 18 -

of the materiality of statements underlying a perjury conviction
is not structural error and was, in the case before it, harmless
beyond a reasonable doubt.

Petitioner maintains that the absence of a jury finding as
to an element of offense is different from the absence of a jury
finding as to a fact that, like an element of an offense, must
be proved to a jury beyond a reasonable doubt, Petitioner would
submit that:

> Although Neder involved the situation where a jury did
> not find facts supporting every element of the crime,
> it still returned a guilty verdict. Like traditional
> harmless error analysis cases, the reviewing court
> could ask whether but for the omission in the jury in-
> struction, the jury would have rendered the same verdict.
> Where Booker violations are at issue, however, the jury
> necessarily did not return a special verdict or explicit
> findings on the aggravating factors, nor did he plead
> guilty to any aggravating factors that would support
> an exceptional sentence. This situation is analogous
> to Sullivan--there is no basis upon which to conduct
> a harmless error analysis. Instead, proponents of harm-
> less error would ask the court to speculate on what
> juries would have done if they had been asked to find
> different facts. This speculation is not permitted.
> Harmless error analysis cannot be conducted on Booker's
> Fifth and Sixth Amendment violations.

However, it cannot be said, that a error resulting from a
violation of both a jury trial determination of guilty and by
the standard of proof beyond-a-reasonable-doubt or admitted to
by the defendant, does not constitute structural error. A violation
of such magnitude can be considered nothing less than structural
error, because, the results of those errors did in fact cause a
"defect affecting the framework within which the trial proceeds"
and these errors also "effected the entire process" which constitutes
Structural error.

## Conclusion

When the Supreme Court announced on January 12, 2005 in <u>Booker</u>, quoting <u>Winship's</u> Fifth Amendment violation of due process in relation to USSG's was unconstitutional, and that the mandatory nature of the Federal Sentencing Guidelines offended the Sixth Amendment, holding that 18 U.S.C. §3553(b) was unconstitutional. The Supreme Court was saying, to be sentenced under under the scheme of the USSG, where a court believed it was under a mandatory obligation to sentence a defendant to a term of imprisonment by a judge, not a jury, by the much less standard of a preponderance-of-evidence, has in fact always been unconstitutional.

As a consequence, when the sentencing judge erroneously believed that the mandatory nature of the guidelines required him to increase a defendant's sentence, by judge-found facts rather than jury-found facts, by the much less standard of a preponderance-of-evidence or admitted to by the defendant, was not exercising its discretion. The outcome, Petitioner was denied the unfettered exercise of the Court's discretion in the imposition of the sentence. The erroneous belief that the Sentencing Guidelines must be mandatory applied, deprived Petitioner of a judge who was free to exercise his discretion in fashioning of a sentence to Petitioner's individual needs and circumstances. The results is analogous to a judge who is biased, an event which constitutes a structural error.

In Petitioner's case, there was no jury finding beyond a reasonable doubt of aggravating factors warranting an enhanced sentence. It would be illogical to perform harmless error analysis in the

absence of those findings. There is no object upon which to apply
harmless error analysis. Instead of asking whether but for the
error the findings would have been the same, the court should be
asking whether but for the error the findings would have been
different. Such an analysis is the equivalent of speculating on
the jury's verdict, which the Supreme Court has held, is never
allowed.

For further support see United States v. Jordan, 291 F.3d
1091, 71 CLR 295 (9th Cir. 2002), where the U.S. Court of Appeals
for the Ninth Circuit held that, when a maximum sentence was enhanced
on the basis of a fact not charged in the indictment and not found
by the jury, a determination that the error did not prejudice the
defendant, as required by harmless-error analysis, would require
too much speculation.

Because the error in Petitioner's case involves a structural
error, that is an error that affects the fundamental fairness of
the proceedings, Petitioner need not show he would have actually
received a less sever sentence if the guidelines had not been followed,
but only the possibility that he might.

The Court, in imposing a sentence which did not represent
the unfettered exercise of the sentencing court's discretion is
an unfair sentence, which should be reviewed.

THE SUPREME COURT'S HOLDING IN <u>UNITED STATES</u> v. <u>BOOKER</u>
IS APPLICABLE TO THIS CASE

The Rule in <u>Booker</u> is Retroactive to Cases on Collateral Review.

In order for the Applicant to be entitled to file a second or successive motion under 28 U.S.C. §2255, he must, in addition to demonstrating the Supreme Court has announced a new rule of constitutional law that was not previously available to him, he must also demonstrate that the Supreme Court has made the holding retroactive to cases on collateral review.

In <u>United States</u> v. <u>Booker</u> 543 U.S. ____ (2005), the Supreme Court held sentencing under the Federal Sentencing Guidelines by judge-determined facts by a preponderance-of-evidence violates the Sixth Amendment right to trial by jury. To remedy the problem the Court judicially amended the Sentencing reform Act of 1996 to make the United States Sentencing Guidelines advisory and not mandatory.

Subsequently, when the Supreme Court announced its holding in <u>Booker</u> that §3553(b)(1) offended the Sixth Amendment, it was saying that under the sentencing regime in effect at the time Applicant was sentenced the district court erroneously believed it had no discretion in imposing the sentence that it imposed upon Applicant, thereby depriving Applicant of his Fifth Amendment right to due process and his Sixth Amendment right to trial by jury.

While it is true that the Supreme Court did not hold the pro-visions of 18 U.S.C. §3553(b)(1) unconstitutional until January 12, 2005, when it announced its holding in <u>United States</u> v. <u>Booker</u>, 543 U.S. ____ (2005), construing the statute to be unconstitutional,

- 22 -

the fact is the statute has always been unconstitutional. It has been unconstitutional from the day of its enactment, which, of course, includes the day the district court imposed its sentence upon Applicant.

It is axiomatic that an unconstitutional statute has no force and effect of law. The Supreme Court in <u>Norton</u> v. <u>Shelby County</u>, 118 U.S. 178 (1886) said:

> The general rule is that an unconstitutional statute, though having the form and name of law, is in reality no law, but is wholly void and ineffective for any purpose, since its enactment. . . In legal contemplation, it is as inoperative as if it had never been passed. . . Since an unconstitutional law is void, the general principles follow that it imposes no duties, confers no right, creates no office, bestows no office, bestows no power or authority on anyone, affords no protection and justifies no acts performed under it. . . .

Thus, at the time Applicant was sentenced, the sentencing court was acting under the erroneous belief that the Federal Sentencing Guidelines were mandatory in nature, and that the sentencing court was bound to follow them. Therefore, the sentencing court imposed a sentence upon Applicant which it believed was required by law.

A sentence <u>not</u> authorized by statute is without the court's sentencing authority to impose. A sentence in excess of that authorized by facts found by the jury or admitted by the defendant is void to the extent of the excess.

This is the law in some circuits. See e.g., <u>Browning</u> v. <u>Crouse</u>, 356 F.2d 178, 180 (10th Cir. 1996); <u>U.S.</u> v. <u>Wainright</u>, 838 F.2d 1069, 1099 (10th Cir. 1991), each quoting <u>United States</u> v. <u>Pridgeon</u>, 153 U.S. 48, 38 L.Ed. 631, 14 S.Ct. 746 (1894).

"[T]he imposition of a sentence in excess of what the law permits does not render the legal or authorized portion of the sentence void, but. . . leaves such portion of the sentence as may be in excess open to question and attack."

In fact, the <u>Pridgeon</u> Court stated the rule even more forcefully:

"[T]he sound rule is that a sentence is legal so far as it is within the provisions of the law and. . . void as to the excess."

<u>United States</u> v. <u>Sanchez</u>, 269 F.3d 1250, 1310 (11th Cir, 2001), Bartlett, J., concurring, quoting <u>Pridgeon</u>, at 62.

The conclusion is thus clear: A void sentence is void <u>ab initio</u>. It is a nullity. It can be the basis of no legal action. A void sentence cannot be waived or defaulted.

No matter how the wrong is characterized, including for example, a violation of the Fifth Amendment right of procedural due process, in that a sentence imposed in violation of the procedures mandated by <u>Apprendi</u>/<u>Blakely</u> and <u>Booker</u>, result in a deprivation of liberty. Applicant is in fact incarcerated on the basis of a nullity, a wrong is obvious. To allow such a wrong to go uncorrected would be no less than a miscarriage of justice.

This is the view shared by the late Chief Justice Rehnquist:

"Every person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees. But a person who has so been convicted is eligible for, and the court may impose, whatever punishment is authorized by statute for his offense. . ."

<u>Chapman</u> v. <u>United States</u>, 500 U.S. 453, 465, 114 L.Ed.2d 534, 111 S.Ct. 1919 (2000). His implication is clear: the imposition of a sentence that is <u>not</u> authorized by statute is violative of due process.

- 24 -

The consequences of 28 U.S.C. §2255's gate keeping rule is a default of the right not to be incarcerated on the basis of a void sentence. Yet this confers upon a void sentence a validity it shall never have. Thus, the statute purports to demand that a void sentence be treated by the courts as a valid act, and that the defendant, who is being held on the basis of a void sentence be treated as being held as a valid sentence.

Retroactivity of a new rule of law to cases on direct appeal is a given, as the Booker Court stated and cited Griffith v. Kentucky, 479 U.S. 314 (1987). Booker, slip op. pg. 25. It does not appear to pose a serious problem for initial filings under 28 U.S.C. §2255 either. Schiro v. Summerlin, 542 U.S. ____, 124 S.Ct. 2519, 159 L.Ed.2d 443 (2004) provides very compelling support for Booker's retroactivity to initial motions filed under 28 U.S.C. §2255. Although the Supreme Court in Summerlin rejected retroactivity of its new procedural rule announced in Ring v. Arizona, 536 U.S. 584 (2000) (holding that a jury, not a judge, must make the findings necessary to impose the death penalty), it did so because the possibility of inaccuracy was minimal in that both fact finders were required to use the same beyond a reasonable doubt standard. But prior to Booker, judges determined sentence enhancements on the basis of a preponderance of the evidence. Post-Booker, these facts must be determined by a jury and proved beyond a reasonable doubt, consequently, pre-Booker the fact finding process so "seriously diminish[ed]" accuracy as to produce an "impermissibly large risk" of injustice. Summerlin, 159 L.Ed.2d at 451.

The Booker rule which remedied that risk is therefore exempt

- 25 -

from the Teague v. Lane, 489 U.S. 288 (1989) retroactivity bar under the watershed rule of criminal procedure exception. See, e.g. In re Winship, 397 U.S. 358 (1970); Ring v. Arizona, supra, discussed in Summerlin.

Booker invalidated the guidelines both on the Sixth Amendment jury trial violation as well as the Apprendi v. New Jersey, 530 U.S. 466 (2000) due process doctrine. Jointly, those bases compel retroactivity. See, e.g., In re Winship; supra; United States v. Hernandez, 137 F.Supp.2d 919, 931-32 (N.D. Ohio 2001), reversed in United States v. Luciano, 311 F.3d 146 (2nd Cir. 2002); United States v. Murphy, 109 F.Supp.2d 1059, 1064 (D. Minn. 2000), reversed, 268 F.3d 599 (8th Cir. 2001). Therefore, Summerlin's reliance on Destefano v. Woods, 392 U.S. 631 (1968) (per curium) (refusing to give retroactive effect to its holding in Duncan v. Louisiana, 391 U.S. 145 (1968) (applying Sixth Amendment right to a jury trial to the states) to reject retroactivity is inconsequential to the issue of Booker's retroactivity. In Destefano, like Summerlin, the fact-finding standard on which retroactivity was claimed was the same, only the fact-finder differed, Booker change those standards exactly as it did in In re Winship, supra (requiring juvenile charges to be proved beyond a reasonable doubt instead of a preponderance, reasoning the reasonable doubt standard "is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence--that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law.'") Because the foundation of Booker's new rule of

- 26 -

constitutional law rests on both the <u>Apprendi</u> due process doctrine and the <u>In re Winship</u> Sixth Amendment right to a jury trial with beyond a reasonable doubt standard of proof, a compelling case for retroactivity exists.

As noted earlier, retroactivity for second or successive motions under 28 U.S.C. §2255, requires the retroactivity to be made by the Supreme Court itself, <u>Tyler</u> v. <u>Cain</u>, 533 U.S. 656 (2001). As the Supreme Court noted in <u>Tyler</u> v. <u>Cain</u>, the Supreme Court can make new rules retroactive (1) by declaration, (2) by application of the rule to a habeas case, id, 533 U.S. at 665, or (3) through multiple holdings which "necessarily dictate retroactivity of the new rule" <u>id</u>., 533 U.S. at 668-70 (O'Conner, J., concurring). <u>Booker</u> has made its new rule retroactive in all three ways prescribed in <u>Tyler</u> v. <u>Cain</u>, and in addition to those, three more which are (4) by making new rules retroactive through Guideline clarifying amendments (5) by modifying the Federal Sentencing Guidelines nunc pro tunc to their November 1, 1987 effective date and (6) in construing and interpreting the Guidelines as Congress would have intended.

### Booker Made Retroactive by Declaration

<u>Booker</u> specifically declared "both the Sixth Amendment holding and [its] remedial interpretation of the Sentencing Act [retroactive] to all cases on direct review." Slip Op. at 25. Instead of limiting retroactivity to cases on direct review, like Mr. Booker's and Mr. Fanfan's, the Supreme Court's statement can be applied to all cases.

This is so because <u>Booker's</u> Sixth Amendment rule simply

- 27 -

"reaffirm[ed] its holding in Apprendi [that] [a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a guilty plea or a jury must be admitted by the defendant or proved to a jury beyond a reasonable doubt." Id., Slip Op. at 20. That rule is but a magnification of its In re Winship rule "that the Constitution protects every criminal defendant 'against conviction' except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime which he is charged." Booker, Slip Op. at 5.

In Ivan V. v. City of New York, 407 U.S. 203, 205 (1972) (per curium) the Supreme Court declared In re Winship must "be given complete retroactive effect." Ivan V. was also a direct appeal case like Booker. However, the Supreme Court declaration left no doubt its retroactivity declaration meant retroactivity to all cases, final or otherwise.

The Court in Ivan V. v. City of New York noted:

> Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial that substantially impairs its truthfinding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect. 'Neither good faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances.' Williams v. United States, 401 U.S. 646, 653, 91 S.Ct. 1148, 28 L.Ed.2d 388, 395 (1971); see Adams v. Illionis, 405 U.S. 278, 280, 92 S.Ct. 916, 31 L.Ed.2d 202, 207 (1972); Roberts v. Russell, 392 U.S. 293, 295, 88 S.Ct. 1921, 20 L.Ed.2d 1100. 1102 (1968).

> Winship expressly held that the reasonable-doubt standard "is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence --that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law. . . . Due process commands that no man shall lose his liberty unless the Government has borne the burden of . . . convincing the fact-finder of his guilt.

> To this end, the reasonable doubt standard is indispensable, impresses
> on the trier of fact the necessity of reaching a subjective state of
> certitude of the facts in issue. 397 U.S. at 363-364.

Ivan V. v. City of New York, 407 U.S. at 204-05.

Plainly, then, the major purpose of the constitutional standard of proof beyond-a-reasonable-doubt announced In re Winship was to overcome an aspect of a criminal trial that substantially impairs the truth-finding function, and for that reason the Supreme Court held that its holding in Winship was to be given complete retroactive effect, Ivan V. v. City of New York, 407 U.S. at 205, There is little doubt but that Winship holding was to be accorded retroactive application not only to cases on direct review, but to cases on collateral review as well. Evidence of it is in the several post-conviction cases in which the Supreme Court subsequently applied variations of its In re Winship rule. See e.g., Yates v. Evart, 500 U.S. 391 (1991) (applying rule in Sandstrom v. Montana, 442 U.S. 510 (1979) that jury instructions on malice or intent violated due process by relieving the state's burden of proving every element beyond a reasonable doubt as required by In re Winship; Francis v. Franklin, 471 U.S. 307 (1985) (applying Sandstrom v. Montana in burden shifting instructions in violation of the In re Winship principle.) Jackson v. Virginia, 443, U.S. 307 (1979) (applying In re Winship rule to insufficiency of evidence standards of review in federal habeas proceedings)).

The holding in Blakely is little more than a restatement of the principles articulated in Winship, which the Supreme Court unequivocally declared to be retroactive. Likewise, the holding in Booker also relied on Winship. The principal objection to Booker's

retroactivity is its potential unsettling effect on the administration of criminal justice. But the Supreme Court itself answered this objection in its holding in <u>Ivan V.</u> v. <u>City of New York</u>, by quoting <u>Williams</u> v. <u>United States</u>, in holding that "Neither good faith reliance by federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice sufficed to require prospective application" of any rule that increases the accuracy of the fact-finding process.

In situations where the new doctrine raises no question about the guilt of the defendant convicted in prior trials, of to the accuracy of the facts utilized in determining the sentence imposed, the rule is ordinarily given prospective application only, and has no retroactive effect. <u>Williams</u>, 401 U.S. at 395.

The holdings of the Supreme Court in <u>Apprendi</u>/<u>Blakely</u> and <u>Booker</u> have as one of its goals, the improvement in the accuracy of the fact-finding process, as well as the inforcement of those rights guaranteed by the Sixth Amendment which were apparently overlooked when the United States Sentencing Commission decided to utilize the "real offense" as a basis for imposing punishment, rather than the "charged offense." In danger of becoming lost or diminished was the defendant's right to a jury trial, and historic role of the jury in the administration of criminal justice.

While it may be true that the accuracy of the fact-finding process is not necessarily implicated in the question of who shall determine those facts, the integrity of the fact-finding process is clearly implicated in the standard of proof used in ascertaining the relevant facts for the purpose of imposing a sentence.

## Booker Made Retroactive by Application

By applying the In re Winship rule to multiple habeas corpus cases, the Supreme Court has also defacto applied its Booker constitutional rule through those past cases. In Booker, and In re Winship are rules of the same type, application of one to proceedings is application of the other, thus making both retroactive under Tyler v. Cain's application of retroactivity method. Id., 533 U.S. at 665. But cf. In re Turner, 267 F.3d 225 (3rd Cir. 2001) (rejecting the same argument as to Apprendi).

## Booker Made Retroactive by Multiple Holdings

It is similarly possible the Supreme Court has made its Booker constitutional rule retroactive through multiple holdings because it held in "Case One [Ivan V.], 407 U.S. at 205 that [the In re Winship] type rule applies retroactively to cases on collateral review and [held] in Case Teo [Booker] that [its] rule of that particular type, then necessarily follows that the [Booker] rule applies retroactively to cases on collateral review."

Thus, given the fact that Apprendi v. New Jersey, supra, is really an extension of the rule announced in In re Winship, it follows that because the Supreme Court had given retroactive effect to the rule announced in In re Winship, see Ivan V. v. City of New York, supra, Booker applies retroactively to cases on collateral review.

## Booker Made Retroactive by Clarification of Amendments

Booker, has arguably made its rule retroactive through its Guideline clarifying amendments. It is well established Guideline clarifying amendments are retroactive. See e.g., United States v.

- 30 -

Garcia-Cruz, 40 F.3d 986, 990 (9th Cir. 1994) ("Under the law of this circuit, amendments to the Sentencing Guidelines which are 'clarifying' as opposed to 'substantive' may be given retroactive effect"); see also, United States v. Stinson, 30 F.3d 121, 122 (11th Cir. 1994) (per curium) (collecting cases). Booker made no substantive changes to the Guidelines. It merely interpreted them (Breyer, J., Slip Opponion, 25) ("our remedial interpretation of the Sentencing Act") advisory as "Congress would have intended" (id., at 2) had it known its mandatory provision violated the Sixth Amendment right to jury trial. See, also id., 22. ("Hence we have examined the statute in depth to determine Congress' likely intent in light of today's holding.") (emphasis original)

Booker's amendment accordingly merely clarified Congress' intent in light of its Sixth Amendment holding. Had Booker "superimpos[ed] its [Sixth Amendment] constitutional requirement announced [therein]" (id., at 3) by engraft[ing] the Court's constitutional requirement onto the sentencing statutes, [it] would [have substantively] destory[ed] the system" (id., at 9). Such substantive change would have produced unintended identical punishment for different degress of similar crimes (id.) and vise-versa (id. at 10) thus destroying Congress' goal of sentence uniformity (id.). Because the Booker Sentencing Reform Act amendments did not change the Guidelines substantively but merely interpreted them as advisory instead of mandatory, such amendment is only a clarifying amendment necessarily retroactive.

Booker's additional amendment to the sentencing appellate process also changed nothing substantively. It only clarified the

standard of review Congress would have preferred in light of its Sixth Amendment holding, Retroactivity of such changes in the post-conviction process is hardly a problem. See, e.g., <u>Collins</u> v. <u>Youngblood</u>, 497 U.S. 37, 111 L.Ed.2d 30, 110 S.Ct. 2715 (1990) (Stevens J., concurring).

### Booker Made Retroactive by Modification of Guidelines

By remedially severing and excising parts of the Federal Sent-encing Act of 1984 akin to legislating (see, e.g., <u>Freeborn</u> v. <u>Smith</u>, 69 U.S. 160, 168 17 L.Ed. 922, 175, 2 Wall 160 (1865)), the Supreme Court in <u>Booker</u> modified the Federal Sentencing Guidelines <u>nunc pro tunc</u> to their November 1, 1987 effective date.

> We answer the question of remedy by finding the provision of the federal sentencing statute that makes the Guidelines mandatory, 18 U.S.C.A. §3353 (b)(1) (Supp. 2004) incompatible with today's constitutional holding. We conclude that this provision must be severed and excised, as must one other statutory section, §3742(e) (main ed. and Supp. 2004), which depends upon the Guidelines' mandatory nature. So modified, the Federal Sentencing Reform Act of 1984, as amended, 18 U.S.C. §3551 et seq., makes the Guidelines effectively advisory.

Congress' power to make or amend remedial statutes retroactively absent <u>Ex Post Facto</u> problems is unquestionable. See, <u>Freeborn</u> v. <u>Smith</u>, 69 U.S. at 168, 17 L.Ed. at 923 ("We do not question the validity of retrospective statues that are purely remedial"); see also <u>Frisbie</u> v. <u>Whitney</u>, 76 U.S. 187, 19 L.Ed. 668, 9 Wall (1969). Retroactivity thereby is a simple matter of intent. See, e.g., <u>Rivers</u> v. <u>Roadway Express</u>, 511 U.S. 298, 311, 128 L.Ed.2d 274, 278, 114 S.Ct. 1510 (1994) ("The question is whether Congress has manifested such an intent.") Because in <u>Booker</u> it is the Supreme Court which remedially modified the Sentencing Reform Act of 1984 as "Congress would have intended" (Breyer, J., Slip Opinion at 25) had it been

known in 1984 its mandatory Sentencing Guidelines violated the
Sixth Amendment (id., at 22) ("we have examined the statute in
depth to determine Congress' likely intent to modify the Guidelines
nunc pro tunc  is dispositive.

### Booker Made Retroactive by Construing & Interpreting Guidelines

Even is the Supreme Court did not assume Congress' role in
modifying the Sentencing Reform Act, in construing and interperting
it as "Congress would have intended" (Breyer, J., Slip Oponion
at 25) had know its mandatory Sentencing Guidelines violated the
Sixth Amendment (id., at 22), the Supreme Court has mecessarily
made Booker retroactive.

Like Booker, the Supreme Court in Patterson v. Mclean Credit
Union, 491 U.S. 164, 105 L.Ed.2d 132, 109 S.Ct. 2363 (1989) Inter-
preted a 123-year old statute differently than appellate courts
had done since its enactment. As to Patterson's retroactivity the
court said:

> A judicial construction of a statute is an authoritative statement of
> what the statute meant before as well as after the decision of the case
> giving rise to that construction[.]

> Thus, Patterson provides the authoritative interpretation of the phrase
> 'made and enforce contracts' in the Civil Rights Act of 1886 before the
> [Congressional] 1991 amendment [overruling Patterson's] interpretation
> provides the base line for our conclusion that the 1991 amendment would
> be 'retroactive' to cases arising before this date.

Rivers v. Roadway Express, 511 U.S. 298, 313, 128 L.Ed. 274, 298.

Unlike Rivers which rejected retroactivity of the relevant
Congressional Amendment because it was not so intended by Congress,
the Supreme Court's judicial construction or interpretation of
the Sentencing Reform of 1984 is inescapable because "the Court
has no authority to depart from the Congressional command setting

the [November 1, 1987] effective date of the [the] law [] it has
enacted []" (River's, 511 U.S. at 313, n. 12, 128 L.Ed.2d 289,
n. 12).


Booker Does Apply Retroactive To Cases On Collateral Review

United States v. Booker, 543 U.S. ___ (2005) applied the
holding in Blakely v. Washington, 542 U.S. ____ (2004) to the
Federal Sentencing Guidelines, and held that because the Sixth
Amendment precludes a judge from making factual determinations
which serve to lengthen a defendant's sentence, the Federal
Sentencing Guidelines could not be mandatory, but must be viewed
as advisory only.

Prior to the Supreme Court's holding in Booker, the Federal
Sentencing Guidelines were believed to be constitutional in
light of the Supreme Court's holding in Mistretta v. United
States, 488 U.S. 361 (1998). Consequently, the Booker holding
did change the legal landscape considerably. It established a
constitutional rule that was not previously available to the
Petitioner. Thus, in failing to raise a Booker claim in his
Direct Appeal or his initial §2255 pleading, he was not guilty
of oversight, or any sort of neglect. The rule was not announced
until January 12, 2005. It therefore established a new rule that
was not previously available to Petitioner. In view of the holding
that 18 U.S.C. §3553(b) offended the Sixth Amendment, it is clear
that Booker announced a new rule of constitutional law.

Thus, it follows that a defendant's Fifth and Sixth Amendment
rights are violated when a Sentencing Court makes a factual deter-

- 34 -

mination of any (fact based) sentencing enhancement rather than the jury by the wrong standard of proof i.e., the preponderance of evidence standard, or admitted by the defendant.

WHEREFORE THE FOREGOING REASONS, Applicant prays this Court to grant him leave to file a successive petition under 28 U.S.C. §2255, to be allowed the opportunity to obtain justice, which has long been denied him, and wherein the issue will be whether the utilization of "relevant conduct" to increase a defindant's sentence which is based on a sentencing Court's (fact based) determination far in excess of anything the trial jury determined, or admitted by the defendant in his criminal case.

### NON-INJECTABLE METHAMPHETAMINE IS A SCHEDULE III CONTROLLED SUBSTANCE AND NOT A SCHEDULE II CONTROLLED SUBSTANCE

The Government asserts that Petitioner's legal claim to the effect that methamphetamine is a Schedule III controlled substance and not a Schedule II controlled substance is without mert, citing United States v. Macedo, 406 F.3d 778, 784-85 (7th Cir. 2005) to support its position that all methamphetamine is a Schedule II controlled substance. The facts in that case, however, involved an indictment which specifically charged in the indictment that methamphetamine  was a Schedule III controlled substance. However, the problem with the history as recited by the Seventh Circuit tells only part of the relevant history.  The Seventh Circuit correctly noted that on July 7, 1971, the Director of the Bureau of Narcotics and Dangerous drugs, (BNDD), "on behalf of the Attorney General," reclassified methamphetamine from a Schedule III drug to a Schedule II Drug.  36 F.R. 12734-12735 (July 7, 1971).  HOwever,

- 35 -

the statute in question provides, in relevant part:

§811. **Authority and criteria for classification of substances.**

**(Rules and regulations of Attorney General; hearing.**

The Attorney General shall apply the provisions of this subcpaher to the controlled substances listed in the schedules established by section 812 of this title and to any other drug or other substance added to such schedules  under this subchapter. . . .

While the statute itself is silent on the question of whether the authority granted by Congress to the Attorney General can be delegated, the fact remains that the Attorney General did not delegate any authority to the Director of the BNDD until well after the Director of the BNDD had purportedly changed meth- amphetamine from Schedule III to Schedule II.

The Comprehensive Drug Abuse Prevention and Control Act of 1970 was enacted into law on October 27, 1970, 84 Stat. 1242, and is popularly known as the "Controlled Substances Act of 1970." Congress provided five different schedules for controlled sub- stances. Schedule II mentioned methamphetamine in thefollowing terms:

(c)   Unless specifically excepted or unless listed in another schedule, any injectable liquid which contains any quantity of methamphetamine, including its salts, isomers, and salts of isomers.

Schedule III, on the otherhand, provides in relevant part as follows:

(3)   Any substance (except injectable liquid which contains any quantity of methamphetamine, including its salts, isomers, and salts of isomers.

Congress has not changed the five schedules since it created them in 1970 when it enacted the Comprehensive Srug Abuse Prevention and Control Act of 1970, 35 years ago.

Less than nine months after the Comphrensive Drug Abuse Prevet-

- 36 -

Attorney General Mitchell did not delegate his authority under 21 U.S.C. §811 until almost a year after the Director of BNDD had sought to change all forms of methamphetamine from Schedule III to Schedule II. Thus, at the itme the Director of BNDD published the July 7, 1971 notice in the Federal Register initiating the change of all forms of methamphetamine from Schedule III to Schedule II, the Director was acting <u>ultra vires</u>. As a consequence, there was no compliance with 21 U.S.C. §812 which provides that the Attorney General shall apply the provisions of the subchapter to the controlled substances listed in the schedules established by section 812 . Clearly, the plain language of the statute allowed the Attorney General to initiate such changes. The historical record clearly establishes that it was the Director of the BNDD eho initiated the change of methamphetaine from Schedule III to Schedule II. Nothing in 18 U.S.C. §811 authorized the Director of the BNDD to initiate the change, since that authority had been delegated by Congress to the Attorney General.

The Attorney General's authority in 21 U.S.C. §811 is not, by any language contained in the statute, capable of delegation to the Director of the BNDD.

In 1973, the Bureau of Narcotics and Dangerous Drugs was abolished, and the Drug Enforcement Administration was established in its place. Following the establishment of the DEA, the Attorney General delegated his authority under 21 U.S.C. §811 to the Director of the DEA. The Director of the DEA simply republished the schedules that had been promulgated by the BNDD in 1971. There was never

- 37 -

any hearings held in connection with the BNDD's initial re-class-
ification of methamphetamine from Schedule III to Schedule II.
21 U.S.C. §811 provides, in relevant part on this point:

> Rules of the Attorney General under this subsection shall be made on the
> record after opportunity for a hearing pursuant to the rulemaking
> procedures prescribed by subchapter II of chapter 5 of Title 5.
> Proceedings for the issuance, amendment, or repeal of such rules may be
> initiated by the Attorney General (1) on his own motion, (2) at the
> request of the Secretary, or (3) on the petition of any interested party.

While the Director of the BNDD would have qualified as an
"interested party" under this subsection, he did not petition
the Attorney General for a change in the schedules, rather, he
undertook to initiate such a change in the schedules himself,
contrary to the plain language of 21 U.S.C. §812.

As a consequence, the change from Schedule III to Schedule
II of non-injectable methamphetamine was not a change that was
done in compliance with the provision which authorized the change.
Certainly there is no language in 21 U.S.C. §811 that authorizes
any official other than the Attorney General to actually change
the schedule.

Because Methamphetamine in a non-injectable form, as was
the case here, remains a Schedule III controlled substance, and
not a Schedule II controlled substance, the maximum penalty under
21 U.S.C. §841(b)(1)(D) is five years, it follows that the sentence
of 120 months for the methamphetamine offense was in error, and
the Defendant's motion should be sustained.

## CONCLUSION

For the foregoing reasons, the Defendant should be accorded

- 38 -

on his motion in that Defendant has made a substantial showing of the denial of a constitutional right, that is the right to due process of law under the Fifth Amendment, the right to effective assistance of counsel under the Sixth Amendment, and the right to a jury determination of those factual issues not specifically admitted by the Defendant which were utilized by the Court to impose a sentence greater than authorized by law, in violation of both Defendant's Fifth and Sixth Amendment rights.

Respectfully submitted,

_Eugene Michael Church_

EUGENE ROBERT CHURCH
Reg. NO. 05638-017
Federal Correctional Institution
Post Office Box 9000
Forrest City, Arkansas 72336-9000,

Defendant, <u>pro se</u>.

## CERTIFICATE OF SERVICE

This is to certify the undersigned did mail a full, true, and correct copy of the foregoing

DEFENDANT'S REPLY TO THE UNITED STATE'S RESPONSE
TO §2255 MOTION

to:

Stephen P. Feaga, Sr.
Assistant United States Attorney
Post Office Box 197
Montgomerry, Alabama 36101-0197

by first-class mail, in a wrapper addressed as aforesaid, with sufficient first-class postage prepaid and affixed thereto, and by depositing the same in the mail receptacle provided for inmate use in mailing legal materials from the Federal COrrectional Institution at Forrest City, Arkansas, on this 11th day of October, 2005.

_Eugene Robert Church_
Eugene Robert Church